# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| DEWITT HUGHES and CHERANZETTA HUGHES, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.: 08-cv-627 |
| CITY OF CHICAGO, et al., | ) ) | Judge Robert M. Dow, Jr., |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Dewitt Hughes and Cheranzetta Stagger-Hughes, have sued the City of Chicago and Chicago Police Officers Mark Uczen and Debbie Iza (collectively "the officers") for violations of state and federal law. Counts I and II are brought pursuant to 42 U.S.C. 1983, alleging unlawful search and seizure of Mr. Hughes' person and Ms. Hughes' car in Count I and unlawful arrest and detention of Mr. Hughes in Count II. Plaintiffs also have asserted *Monell* claims against the City of Chicago in Counts I and II. Plaintiffs' remaining claims allege state law violations: False Imprisonment (Count III) and Malicious Prosecution (Count IV) against the officers and Respondeat Superior (Count V) and Indemnification (Count VI) against the City of Chicago. Defendants have moved for summary judgment on all counts, although Defendants have conceded that partial claims under Counts I and II should survive summary judgment. For the reasons set forth below, Defendants' motion [77] is granted in part, denied in part, and remains under advisement in part.

## I. Factual Background[1]

### A. Plaintiff Dewitt Hughes' Arrest

On the evening of July 30, 2007, at approximately 10:00 p.m., Dewitt Hughes drove to pick up his wife, Cheranzetta, at the end of her shift as a bus driver for the Chicago Transit Authority. Cheranzetta had with her a blue, zippered, opaque lunch sack, which she placed on the backseat of the car. Within the lunch sack was a plastic bag containing approximately fifteen vitamins that had been purchased at Wal-Mart earlier that day. On their way home, Dewitt dropped his wife off at Walgreens and headed to his mother's house to retrieve some clothes before returning to Walgreens to pick up Cheranzetta. According to Dewitt, he drove east on Fullerton, turned right onto Laramie, and began heading southbound on Laramie. According to Defendant Officers Mark Uczen and Debbie Iza, Dewitt went "right past" their unmarked police car and ran a red light. Before Dewitt reached the intersection of Laramie and Grand, he was pulled over by Officers Uczen and Iza.[2] Dewitt claims that he did not violate any traffic laws prior to being pulled over.

---

[1] Where the parties disagree over relevant facts, the Court sets forth the competing versions. In addition, the Court resolves genuine factual ambiguities in Plaintiffs' favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

[2] According to Defendants' statement of uncontested facts, Defendant Officers Uczen and Iza first observed Dewitt traveling "southbound on Laramie just about at Fullerton." Defendants then state that Dewitt approached the intersection of Fullerton and Laramie and made a right turn. First, the Court notes that the officers could not have observed Dewitt make a right turn from Fullerton onto southbound Laramie if they "first observed" him driving southbound on Laramie. Defendants also claim that the officers were stopped at a red light at the intersection of Fullerton and Laramie, facing eastbound, when they observed Dewitt. Despite a citation to deposition testimony that purports to establish this fact, Defendants have failed to provide the Court with any evidence that in fact does establish the officers' location at the time they first observed Dewitt. Rather, the deposition testimony cited and provided to the Court fails to mention anything about the officers' location. Moreover, if Defendants were stopped at a red light, facing eastbound, they necessarily would have been on Fullerton (a street which runs east and west), at the exact location in which Dewitt allegedly stopped before turning right onto Laramie. While, at the end of the day, Defendants' factual missteps do not affect the Court's resolution of the issues, this is just one example of several inconsistencies and typographical errors in Defendants' submissions. Errors such as these make it difficult for the Court to piece together the factual background of a case.

2

According to Dewitt, he asked Officer Uczen why he had been pulled over, but Uczen would not respond to his question. Instead, Officer Uczen asked Dewitt to exit the car, and Dewitt complied. Uczen then patted Dewitt down. In her deposition, Officer Iza testified that while Uczen was dealing with Dewitt, she walked to the passenger side of the vehicle and saw a plastic bag containing numerous capsules on the passenger's seat. According to Iza, she then got the attention of Officer Uczen, who was at the back of the car with Dewitt. Uczen testified that he looked through the passenger window and also observed a plastic bag with numerous capsules containing a "white powdery substance" on the passenger's seat. One of the officers retrieved the bag from the vehicle and inspected the contents. The officers did not have field test kits for suspected narcotics with them during this stop.[3] Believing that the capsules contained narcotics, the officers arrested and handcuffed Dewitt. Dewitt was angry and refused to get into the officers' squad car, so they requested a transport vehicle. The Hughes' vehicle was impounded.

Plaintiffs' version of the stop and arrest differs from the officers' story at several crucial junctures. First, Cheranzetta testified that she did not leave the vitamins on the front passenger seat when Dewitt dropped her off at Walgreens; rather, she claims that they were stored in her blue, opaque lunch bag that was zippered shut and that she had placed on the back seat after Dewitt picked her up.[4] She also claims that when she went to retrieve her property from her impounded car, the lunch bag was still on the back seat and that it had been searched. Next,

---

[3] Both officers testified that they believed that these kits were not available in the Chicago Police Department.

[4] Defendants correctly note that Cheranzetta was not present at the time Dewitt was pulled over; however, Cheranzetta's testimony regarding where she placed her lunch bag, as well as her testimony as to where she found her lunch bag when she retrieved it from the impounded car, is relevant to the issues in this case. At this juncture, Plaintiffs are entitled to have all reasonable inferences from this evidence drawn in their favor; if the case proceeds to trial, the trier of fact will decide how much weight to give, and what inferences should be drawn, from all of the testimony concerning the location of the lunch bag.

Dewitt denies that he ran a red light or committed any traffic offense prior to the stop. He also testified that while Officer Uzcen was patting him down, Officer Iza got in his car and searched it. He further stated that his wife's lunch bag was in the back seat of the car, that he never saw the vitamins that night, and that he did not even know that they were in the car. Finally, according to Dewitt, prior to arriving at the police station, the officers refused to answer his questions and did not tell Dewitt what – if anything – they had found in his car.

At the police station, Dewitt learned that the officers believed they had found heroin in his car. At some point prior to his initial appearance, Dewitt told them that the pills they found must have been his wife's vitamins. Dewitt's explanation notwithstanding, he was charged with possession of heroin. Dewitt remained in the police station "lock up" facility until his bond hearing on August 1, 2007. He received a $20,000 bond and the judge set his bail at $2,000. Unable to post bail, Dewitt was transported to Cook County Jail. Three days after his bond hearing, he was released from Cook County Jail and put on house arrest with electronic monitoring. After he returned home, and as a result of his house arrest, he was fired from his job as a truck driver. On August 22, 2007, the charges against Dewitt were dismissed *nolle prosequi*.

### B. Exculpatory Lab Results

After Officer Uczen inventoried the vitamins, he sent them to the Illinois State Police Laboratory for testing. On or about August 9, 2007, Uczen received a copy of the laboratory report from the Illinois State Police Laboratory, which stated that the capsules removed from the Hughes' car had tested negative for the presence of illegal substances. Uczen showed the report to Officer Iza and then filed the report in his desk drawer. The laboratory also transmits the report to the Cook County State's Attorney's Office; however, it is not clear from the record

4

when the assistant state's attorney assigned to Dewitt's case received a copy of Dewitt's lab report. Typically, the state's attorney assigned to the case accesses the report a day or two prior to the scheduled preliminary hearing.

According to the testimony of the assistant state's attorney deposed in this case, there is no expectation that the arresting officer will provide a copy of the lab report to the prosecutor. Officers Uczen and Iza, as well as their supervisor Sergeant Mateo Mojica, testified that they are not aware of any policy or practice that directs officers as to what to do when they receive notification from the Illinois State Police that putative drug material was determined to be non-narcotic. The Chicago Police Department training bulletin on reporting responsibilities for narcotics cases is silent as to any obligation to inform the prosecution of a negative lab result.

## II.     Discussion

### A.     Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual disputes that are irrelevant to the outcome of the suit "will not be counted." *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003) (quotation marks and citations omitted). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

B.   **Plaintiffs' Fourth Amendment Claims**

Counts I and II are brought pursuant to 42 U.S.C. § 1983, alleging unlawful search and seizure of Dewitt Hughes' person and Cheranzetta Hughes' car in Count I and unlawful arrest and detention of Dewitt in Count II. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress * * * *

42 U.S.C. § 1983. Section 1983 "creates a federal cause of action for 'the deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States.'" *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997) (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994)). "Section 1983 is not itself a source of substantive rights; instead it is a means for vindicating federal rights conferred elsewhere." *Id*.

To state a claim under § 1983, a plaintiff must show (1) an action taken under color of state law, and (2) a deprivation of a right protected by the Constitution. See *Brown v. City of Lake Geneva*, 919 F.2d 1299, 1301 (7th Cir. 1990).

Plaintiffs assert that Officers Uczen's and Iza's searches of Dewitt's person and Cheranzetta's car violated the Fourth Amendment's prohibition against unlawful search and seizure. Defendants concede that the facts, taken in the best light for Plaintiffs, allow Dewitt to survive summary judgment on his claim that he was unlawfully seized when the officers stopped the vehicle he was driving for alleged traffic violations, as Dewitt denies that he committed any traffic offense. However, Defendants contend that the claim survives only up to the point in time when the officers discovered the suspected narcotics in the vehicle, as that discovery gave them probable cause to seize Dewitt and the car. Defendants argue that the search of Dewitt's person and car was justified because the suspected narcotics were in "plain view" on the front set of the car, giving the officers probable cause to arrest Plaintiff, search his person, and impound the vehicle.

While it is true that a search incident to a valid arrest is permissible without a search warrant, even if the arrest is for a minor traffic violation (see *United States v. Robinson,* 414 U.S. 218, 235 (1973) ("all custodial arrests [are] alike for purposes of search justification")), the problem for Defendants is that the probable cause that they claim gave them the authority to make a valid arrest rests on disputed facts. First, Defendants concede that there is a dispute as to whether they had justification for stopping Dewitt. However, Defendants argue that even if Plaintiffs dispute that fact, they had probable cause to seize Dewitt as soon as they observed the suspected narcotics in "plain view" on the front seat. Generally, incriminating objects in a lawfully positioned officer's plain view are subject to seizure. See *U.S. v. Williams,* 495 F.3d

7

810, 815 (7th Cir. 2007) (citing *Texas v. Brown,* 460 U.S. 730, 740 (1983)). Yet Plaintiffs have presented evidence that the vitamins (which the officers, upon inspection, surmised to be heroin), were not in plain view, but instead were concealed in an opaque blue bag in the back seat of Plaintiffs' car. Thus, the officers' ability to observe the vitamins in plain view is disputed, and it is for the fact finder to determine the weight and credibility to be accorded the differing accounts. Consequently, a genuine issue of material fact exists concerning whether the officers had probable cause to search and detain Plaintiff Dewitt and to search and impound Plaintiff Cheranzetta's car.

Defendants next contend that, even if the search of Plaintiffs' car was illegal, they are shielded by qualified immunity. The Supreme Court has established a two-part test for qualified immunity: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Wheeler v. Lawson,* 539 F.3d 629, 639 (7th Cir. 2008) (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)); see also *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). Although Defendants must raise qualified immunity as an affirmative defense, Plaintiffs bear the burden of defeating it. *Id.* Because the Court has determined that Plaintiffs have presented evidence of an unconstitutional search and seizure of Dewitt and the vehicle when the facts are taken "in the light most favorable" to Plaintiffs, the Court will focus on the second prong of the qualified immunity test: whether Defendants acted reasonably in conducting the search and seizure. See *Pearson*, 129 U.S. at 818.

Taking the evidence in the light most favorable to Plaintiffs, this was a stop and subsequent search that was not conducted pursuant to the plain view doctrine; rather, it was performed by an officer who began looking through the car prior to Plaintiff Dewitt's arrest. The

search allegedly took place before evidence of the suspect narcotics was found, at a time when Plaintiff had only been pulled over for a traffic violation (the basis for which is also disputed). The search then, viewed in the light most favorable to Plaintiffs, was made without probable cause to suspect that Plaintiffs possessed contraband or other evidence of criminal activity. That alleged conduct, if credited by the trier of fact, violates Plaintiffs' "clearly established" rights to be free from searches that are not supported by probable cause. See, *e.g., United States v. Ross,* 456 U.S. 789, 809 (1982) (warrantless search of an automobile requires probable cause to believe it contains contraband) (citing *Carroll v. United States,* 267 U.S. 132 (1925)); *United States v. Hines,* 449 F.3d 808, 814 (7th Cir. 2006) (same).

Defendants appear to argue that the search that occurred *after* Plaintiff was arrested was a search justified by the inventory search exception to the warrant requirement. The real question here, however, is whether the initial search of Plaintiffs' car, which allegedly took place *before* Plaintiff's arrest, was justified. For the reasons stated above, there are factual disputes concerning whether the conduct was justified under clearly established law. Accordingly, Defendants are not entitled to summary judgment on the ground of qualified immunity.

### C. Plaintiff Dewitt's Fourteenth Amendment Due Process Claim

Although the Court has determined that a factual dispute exists concerning whether the officers had probable cause to stop Dewitt, search him and the car, and then detain Dewitt and impound the car (and thus Plaintiffs' Fourth Amendment claims pursuant to § 1983 survive summary judgment), the question remains whether Plaintiff Dewitt's Fourteenth Amendment due process claim survives. "It is true that at some point after a person is arrested, the question whether his continued confinement or prosecution is unconstitutional passes over from the Fourth Amendment to the [Fourteenth Amendment's] due process clause." *Jones v. City of*

*Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) (internal citations omitted). Plaintiffs claim that Officer Uczen hid exonerating information from the state, rather than disclosing it to the prosecutor, and thus violated Plaintiff Dewitt's due process rights.

The first problem with Plaintiff Dewitt's position is that once his § 1983 claim shifted from a Fourth Amendment violation to a Fourteenth Amendment violation, his claim essentially became one for malicious prosecution, rather than for a due process violation. See *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003) (finding that "to the extent [plaintiff] maintains that [defendant] denied him due process by causing him to suffer a deprivation of liberty from prosecution and a contrived conviction * * * deliberately obtained from the use of false evidence, his claim is, in essence, one for malicious prosecution, rather than a due process violation.") (internal citations omitted). As the Seventh Circuit emphasized in *Newsome v. McCabe,* "the existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution." 256 F.3d 747, 750 (7th Cir. 2001). Illinois has a common law tort action for malicious prosecution.[5] *Miller v. Rosenberg,* 749 N.E.2d 946, 951-52 (Ill. 2001). Thus, any claim that Dewitt has for malicious prosecution arises under Illinois law. *Newsome,* 256 F.3d at 750. "In sum, [Plaintiff] cannot do an end run around the foregoing precedent by combining what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment." *McCann*, 337 F.3d at 786.

Presumably in an attempt to get around this problem, Plaintiff directs the Court's attention to *Jones v. City of Chicago*, which Plaintiff argues stands for the proposition that when a police officer learns that an accused is innocent, but then sits on that evidence rather than

---

[5] Indeed, Plaintiff has covered his bases and brought a malicious prosecution claim pursuant to Illinois state law.

disclosing it to prosecutors, the officer violates the accused's right to due process. See *Jones*, 856 F.2d at 994 ("If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. They cannot hide behind the officials whom they have defrauded."). While *Jones* and the additional cases cited by Plaintiffs recognize that "[a] police officer who withholds exculpatory information from the prosecutor can be liable under [§ 1983]," the cases also state that liability only exists where "the officer's failure to disclose the exculpatory information deprived the § 1983 plaintiffs of their right to a fair trial." *Jean v. Collins*, 221 F.3d 656, 659 (4th Cir. 2000) (en banc). The cases cited by Plaintiffs involved scenarios in which the exculpatory evidence was known only by officers, and not by the prosecutor, and then the officers deliberately concealed the evidence. That predicament does not exist here.

The facts established in this case demonstrate that the exculpatory lab results were disseminated to both the Chicago Police Department and to the state's attorney's office. Once the prosecutor received and reviewed the exculpatory evidence, which was before the preliminary hearing, the charges against Plaintiff Dewitt were dismissed. The assistant state's attorney deposed in this case testified that there is no expectation that the arresting officer will provide a copy of the lab report to the state's attorney's office; rather, the prosecutor assigned to a case usually will access the report from the computer a day or two prior to the scheduled preliminary hearing, which occurred in Dewitt's criminal prosecution. This procedure is in line with the Supreme Court's pronouncement in *Kyles v. Whitley* that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." 514 U.S. 419, 437-38 (1995). In *Jean v. Collins*, a case cited

11

by Plaintiffs, the Fourth Circuit expounded on the policy behind the Supreme Courts pronouncement in *Kyles*: "To hold officers responsible under § 1983 for internal miscommunication that *Kyles* charges the prosecution with preventing is to have § 1983 suits and *Brady* doctrine heading in diametrically opposed directions."[6] Moreover, "the § 1983 suit could well set up a continual exercise in finger-pointing between prosecutors and police over whose fault it was that the evidence never reached the defendant." *Id.*

Moreover, "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Daniel v. Williams*, 474 U.S. 327, 328 (1986). Daniels holds that no "deprivation" under the Fourteenth Amendment occurs on account of official negligence. *Id.* at 330-33. Plaintiffs have not presented any evidence that Defendant Officers acted in bad faith by not contacting the prosecutors, particularly in light of Defendants' uncontroverted evidence that there is no expectation by the state's attorney's office that police officers provide copies of lab reports to the prosecutors. In the Court's view, the Illinois State Police Laboratory's procedure of sending the results to both the police and the prosecutors, rather than relying on the police to notify the prosecutors, appears to be a reasonable, efficient, and comprehensive way of handling potentially exculpatory information. For all these reasons, Plaintiff Dewitt's due process claim fails.

---

[6] Wisely, Plaintiffs' counsel in this case did not style Dewitt's due process claim as a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). "A Brady violation occurs when the government fails to disclose evidence materially favorable to the accused." *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006). "While a court may find that a Brady violation has occurred even when the suppressed evidence is known only to police investigators and not to the prosecutor" (*id.* at 870), any *Brady* claim based on the facts of this case would have failed because "[e]ven late disclosure does not constitute a *Brady* violation unless the defendant is unable to make effective use of the evidence." *Bielanski v. County of Kane*, 550 F.3d 632, 645 (7th Cir. 2008).

## C. *Monell* Claims (Counts I and II against Defendant City of Chicago)

*Monell v. Department of Social Services of City of New York* provides that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." 436 U.S. 658, 691 (1978). Rather, "[a] municipality only may be held liable under § 1983 for constitutional violations caused by the municipality itself through its own policy or custom." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). In order to state a § 1983 claim against a municipality, the complaint must allege that an official policy or custom not only caused the constitutional violation, but was "the moving force" behind it. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389 (1989); see also *Arlotta v. Bradley Center,* 349 F.3d 517, 521-22 (7th Cir. 2003); *Gable v. City of Chicago,* 296 F.3d 531, 537 (7th Cir. 2002). The "official policy" requirement for liability under § 1983 is to "distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479 (1986). "Misbehaving employees are responsible for their own conduct[;] 'units of local government are responsible only for their policies rather than misconduct by their workers.'" *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007)).

To state a § 1983 claim against a municipality, Plaintiffs must "allege that (1) the city had an express policy that, when enforced, causes a constitutional deprivation; (2) the city had a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage within the force of law; or (3) plaintiff's constitutional injury was caused by a person with final policymaking authority." *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). A city's "failure to provide

proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton*, 489 U.S. at 390. Establishing *Monell* liability based on evidence of inadequate training or supervision requires proof of "deliberate indifference" on the part of the local government. *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029 (7th Cir. 2006) (citing *City of Canton*, 489 U.S. at 388)). Proof of deliberate indifference can take the form of either "(1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers." *Id*. at 1029-30 (citing *City of Canton*, 489 U.S. at 390 & n. 10)).

> 1. *Allegations of the City of Chicago's failure to maintain a practice or policy, or to train officers, on turning over exculpatory lab reports to prosecutors*

Plaintiffs allege that the City of Chicago maintains no policy, practice, or officer training regarding turning over exculpatory laboratory results to prosecutors. "A failure to train theory or a failure to institute a municipal policy theory requires a finding that the individual officers are liable on the underlying substantive claim." *Tesch v. County of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998); see also *Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003) ("a municipality cannot be found liable if there is no finding that the individual officer is liable on the underlying substantive claim"); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Because the Court has determined that Defendants Uczen and Iza did not violate Plaintiff's constitutional rights when they failed to give a copy of the exculpatory lab report to the state's attorney's office, Plaintiff's § 1983 claim against the City for failing to maintain a practice, police, or officer training on this conduct fails.

## 2. Allegations of the City of Chicago's failure to maintain a practice or policy, or to train officers, regarding field testing kits

Plaintiffs contend that if Officers Uzcen and Iza had been able to conduct a preliminary field test of the vitamins right on the scene, or even at the police station, then they quickly could have determined that the substance in the capsules was not heroin, and Dewitt could have been spared the drug arrest, incarceration, and weeks of house arrest. Plaintiffs further claim that the police department does not provide officers with any instruction about how and when to conduct preliminary field tests. On the basis of these contentions, Plaintiffs insist that the City of Chicago faces *Monell* liability for its "utter failure to provide proper training to its officers on how to use those readily available kits."

Plaintiffs bear the burden of proving the alleged policy, custom, or usage at trial. See *Palmer v. Marion County,* 327 F.3d 588, 595 (7th Cir. 2003). Therefore, to survive summary judgment, Plaintiffs must set forth specific facts showing that there is a genuine issue of material fact regarding the existence of such a policy, custom, or usage. *Id.*; see also *Rodgers v. Lincoln Towing*, 771 F.2d 194, 202 (7th Cir. 1985) ("Boilerplate allegations of a municipal policy, entirely lacking in any factual support that a city policy does exist, are insufficient."). The sole legal authority in support of Plaintiffs' claim is a Western District of Texas decision in which the court determined, at the pleadings stage, that a plaintiff's claim against the city for inadequately training police officers on conducting narcotic field tests was not futile. See *Bittakis v. City of El Paso*, 2007 WL 949521, at *2 (W.D. Tex. Mar. 13, 2007) (denying plaintiff's motion to amend complaint despite the court's determination that plaintiff's proposed amendment was not futile but noting that the court was not commenting on whether the proposed claim would survive a summary judgment motion). And, as Plaintiffs' own case indicates, the "deliberate indifference" standard that applies to attempts to impose *Monell* liability based on evidence of inadequate

15

training or supervision "usually requires a plaintiff to 'demonstrate a pattern of violations.'" *Id.* at *2 (quoting *Davis v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005)).

But before deciding whether Plaintiffs' legal theory is viable, the Court first must address Defendants' contention that Plaintiffs lack any admissible evidence in support of any *Monell* claim relating to field test kits. Every factual citation in support of Plaintiffs' argument on its *Monell* claim related to field test kits is to deposition testimony given in another case, *Daniels v. City of Chicago*, Case No. 08-cv-6832, by a Chicago police officer, Michael Nunez, who is not a party to this case. See Pls. Stmt. Facts ¶¶ 34-40 & Ex. M (selected excerpts from deposition). Officer Nunez was deposed on May 18, 2009, almost four months after the close of fact discovery in this case in January 2009. Plaintiffs' attempt to rely on Officer Nunez's deposition testimony raises threshold questions that must be resolved prior to the issuance of a ruling on Defendants' motion for summary judgment on the *Monell* claim relating to the field testing kits. Plaintiffs have presented no authority in support of the proposition that a court may consider as competent evidence at the summary judgment stage deposition testimony gathered in another case – particularly where, as here, it appears that Defendants' counsel had no prior notice of the deposition and therefore no opportunity to examine the witness themselves in regard to the subject of his testimony.

"At the summary judgment stage, a party may rely on deposition testimony from a separate action where the case involved the same parties and subject matter." *Wallace v. City of Tarpon Springs*, 2007 WL 128839, at *2 (M.D. Fla. Jan. 12, 2007) (citing Fed. R. Civ. P. 32(a)(4) and Fed. R. Evid. 804(b)(1)); see also *Northwest Hamilton Lake Development Co. v. American Federal, Inc.*, 2006 WL 47432, at *7 (E.D. Mo. Jan. 9, 2006) ("depositions in other cases can only be used in the present litigation to challenge summary judgment if such

depositions involved the same parties and same subject matter") (citing Fed. R. Civ. P. 32(a)(4)). Among the pertinent questions are "whether the underlying issues are the same and whether the party opposing the deposition's admission had adequate motive and opportunity to develop the witness' testimony as relevant to the case at hand." *Wallace*, 2007 WL 128839, at *3 (citing *Clay v. Buzas*, 208 F.R.D. 636, 637 (D. Utah 2002). And the burden of proving that the deposition testimony is admissible falls on the proponent of the testimony – here, Plaintiffs. See *Wallace*, 2007 WL 128839, at *3-*4 (granting motion to strike deposition testimony of witness who "was never referenced in this case through Rule 26 disclosures or in response to any discovery request," whose "name was first referenced in Plaintiffs' motion for summary judgment").

As the cases cited above indicate, there are some circumstances in which deposition testimony from another case may be admissible on summary judgment. However, the information presented to the Court thus far is insufficient to determine whether this case presents those circumstances. Accordingly, the Court requests expedited supplemental briefing as set forth below. As discussed above, the onus is on Plaintiffs to show the similarity of issues and parties and the opportunity and incentive on the part of Defendants to probe the testimony as "relevant to the case at hand." *Wallace*, 2007 WL 128839, at *3. Plaintiffs also may wish to address the efforts that they undertook during the discovery process in *this* case to try to obtain the information that they seek to inject into the case after the close of fact discovery. Plaintiffs' counsel must have been aware of the City's evidence at the time that Defendants' witnesses made their statements – which Nunez's testimony purportedly contradicts – and prior to the discovery deadline in this case. Plaintiffs were given leave to file their amended complaint, adding *Monell* claims, on November 18, 2008. Shortly thereafter, Magistrate Judge Cox

17

extended the discovery deadline until the end of January 2009, presumably to give Plaintiffs additional time to conduct *Monell* discovery. During that time (or any further extension or reopening of discovery), Plaintiffs presumably sought testimony to bolster their *Monell* claims. See, *e.g.*, *Meredith v. Principi*, 2001 WL 856283, at *1 (N.D. Ill. July 27, 2001) ("As a general matter, a plaintiff cannot wait until she sees a defendant's motion [for summary judgment] to then conduct unilateral discovery with the expectation that such testimony could be used to fend off summary judgment. An appropriate response to reading defendant's motion is to seek leave to reopen discovery. That was not done here.").

To assist the Court in reaching a proper disposition of Defendants' motion for summary judgment on the *Monell* claim relating to the field testing kits, the Court requests that Plaintiffs file a short supplemental memorandum of law by 12/4/09 addressing (i) the propriety of considering the deposition testimony of Officer Nunez in another case as competent evidence in opposition to Defendants' summary judgment motion in this case and (ii) assuming that Officer Nunez's deposition testimony is generally admissible, why his testimony should be considered in this case despite the fact that it was gathered well past the fact discovery deadline. Defendants are given to 12/11/09 to file a short supplemental response to Plaintiffs' additional brief. After the supplemental briefing is complete, the Court will issue a decision on the viability of Plaintiffs' *Monell* claim relating to the field testing kits in due course.

**D.     State Law Claims**

In Count III (False Imprisonment), Plaintiffs allege that Dewitt was unlawfully detained by Defendants and that Defendants' actions were undertaken intentionally, with malice and reckless indifference to Plaintiff's rights. In Count IV (Malicious Prosecution), Plaintiffs allege

that Dewitt was improperly subjected to judicial proceedings for which there was no probable cause, and that these proceedings were instituted and maintained maliciously.

Defendants' sole argument in seeking dismissal of both of these claims is that "the existence of probable cause" bars Plaintiff from pursuing these claims. Since the Court has previously determined that a genuine issue of material fact exists concerning whether the officers had probable cause to search and detain Plaintiff Dewitt and to search and impound Plaintiff Cheranzetta's car, summary judgment on that basis is not proper. Furthermore, because Defendants failed to advance any additional arguments beyond the disputed contention that probable cause had been established for Plaintiff's arrest, Defendants' motion for summary judgment as to Plaintiff Dewitt's state law claims of False Imprisonment and Malicious Prosecution is denied.

Defendants only argument for dismissing Plaintiffs' state law Respondeat Superior (Count V) and Indemnification (Count VI) claims is that the City "cannot be held liable or directed to indemnify Defendant Officers if Defendant Officers cannot be held liable." Again, Defendants' base their argument that Defendant Officers are not liable on the disputed contention that probable cause had been established for Plaintiff's arrest. Thus, summary judgment as to Counts V and VI likewise is denied.

### III. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment [77] is granted in part and denied in part. The Court grants the motion as to Plaintiffs' § 1983 and *Monell* claims against the individual officers and the City of Chicago for violation of Plaintiff Dewitt's Fourteenth Amendment due process right. The motion remains under advisement as to Plaintiffs' *Monell* claim relating to the field testing kits. The Court denies the motion in all other respects.

Dated: November 25, 2009

_____
Robert M. Dow, Jr.
United States District Judge