IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEWITT HUGHES and CHERANZETTA HUGHES, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.: 08-cv-627 |
| CITY OF CHICAGO, et al., | ) ) | Judge Robert M. Dow, Jr., |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, Dewitt Hughes and Cheranzetta Stagger-Hughes, sued the City of Chicago and Chicago Police Officers Mark Uczen and Debbie Iza for violations of state and federal law. Counts I and II were brought pursuant to 42 U.S.C. 1983, alleging unlawful search and seizure of Mr. Hughes' person and Ms. Hughes' car in Count I and unlawful arrest and detention of Mr. Hughes in Count II. Plaintiffs also asserted *Monell* claims against the City of Chicago in Counts I and II. Plaintiffs' state law claims included False Imprisonment (Count III) and Malicious Prosecution (Count IV) against the officers and Respondeat Superior (Count V) and Indemnification (Count VI) against the City of Chicago. Defendants moved for summary judgment on all counts, which the Court granted in part, denied in part, and took under advisement. The Court granted the motion as to Plaintiffs' § 1983 and *Monell* claims against the individual officers and the City of Chicago for violation of Plaintiff Dewitt's Fourteenth Amendment due process right. The motion remained under advisement as to Plaintiffs' *Monell* claim relating to the field testing kits.

Defendants now have brought a second motion for summary judgment [159], this time seeking summary judgment on Plaintiffs' remaining *Monell* claim. Plaintiffs' *Monell* claim against the City asserts that the City of Chicago failed to maintain a practice or policy, or to adequately train officers, regarding narcotic field testing kits. For the reasons set forth below, the Court grants Defendants' motion for summary judgment [159] on Plaintiffs' *Monell* claim.

**I.     Factual Background[1]**

On the evening of July 30, 2007, at approximately 10:00 p.m., Dewitt Hughes drove to pick up his wife, Cheranzetta, at the end of her shift as a bus driver for the Chicago Transit Authority. Cheranzetta had with her a blue, zippered, opaque lunch sack, which she placed on the backseat of the car. Within the lunch sack was a plastic bag containing approximately fifteen vitamins that had been purchased at Wal-Mart earlier that day. On their way home, Dewitt dropped his wife off at Walgreens and headed to his mother's house to retrieve some clothes before returning to Walgreens to pick up Cheranzetta. On his way, Dewitt was pulled over by Officers Mark Uczen and Debbie Iza. Officer Uczen asked Dewitt to exit the car, and Dewitt complied. Uczen then patted Dewitt down. In her deposition, Officer Iza testified that while Uczen was dealing with Dewitt, she walked to the passenger side of the vehicle and saw a plastic bag containing numerous capsules on the passenger's seat. According to Iza, she then got the attention of Officer Uczen, who was at the back of the car with Dewitt. Uczen testified that he looked through the passenger window and also observed a plastic bag with numerous capsules containing a "white powdery substance" on the passenger's seat. One of the officers retrieved

---

[1] The full factual history of this case is set forth in the Court's first summary judgment opinion [103]. Here, the Court sets forth facts relevant to the current summary judgment motion. Where the parties disagree over relevant facts, the Court sets forth the competing versions. In addition, the Court resolves genuine factual ambiguities in Plaintiffs' favor, as Plaintiffs are the non-movants. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

the bag from the vehicle and inspected the contents. The officers did not have field test kits for suspected narcotics with them during this stop. Both officers testified that they believed that these kits were not available in the Chicago Police Department. Believing that the capsules contained narcotics, the officers arrested and handcuffed Dewitt. The Hughes' vehicle was impounded.

Plaintiffs' version of the stop and arrest differs from the officers' story at several crucial junctures. First, Cheranzetta testified that she did not leave the vitamins on the front passenger seat when Dewitt dropped her off at Walgreens; rather, she claims that they were stored in her blue, opaque lunch bag that was zippered shut and that she had placed on the back seat after Dewitt picked her up. She also claims that when she went to retrieve her property from her impounded car, the lunch bag was still on the back seat and that it had been searched. Dewitt further stated that his wife's lunch bag was in the back seat of the car, that he never saw the vitamins that night, and that he did not even know that they were in the car. Finally, according to Dewitt, prior to arriving at the police station, the officers refused to answer his questions and did not tell Dewitt what – if anything – they had found in his car.

At the police station, Dewitt learned that the officers believed they had found heroin in his car. At some point prior to his initial appearance, Dewitt told them that the pills they found must have been his wife's vitamins. Dewitt's explanation notwithstanding, he was charged with possession of heroin. Dewitt remained in the police station "lock up" facility until his bond hearing on August 1, 2007. He received a $20,000 bond and the judge set his bail at $2,000. Unable to post bail, Dewitt was transported to Cook County Jail. Three days after his bond hearing, he was released from Cook County Jail and put on house arrest with electronic monitoring. After he returned home, and as a result of his house arrest, he was fired from his job

as a truck driver. On August 22, 2007, the charges against Dewitt were dismissed pursuant to a *nolle prosequi*.

After Officer Uczen inventoried the vitamins, he sent them to the Illinois State Police Laboratory for testing. On or about August 9, 2007, Uczen received a copy of the laboratory report from the Illinois State Police Laboratory, which stated that the capsules removed from the Hughes' car had tested negative for the presence of illegal substances. Uczen showed the report to Officer Iza and then filed the report in his desk drawer. The laboratory also transmits the report to the Cook County State's Attorney's Office; however, it is not clear from the record when the assistant state's attorney assigned to Dewitt's case received a copy of Dewitt's lab report. Typically, the state's attorney assigned to the case accesses the report a day or two prior to the scheduled preliminary hearing.

According to the testimony of the assistant state's attorney deposed in this case, there is no expectation that the arresting officer will provide a copy of the lab report to the prosecutor. Officers Uczen and Iza, as well as their supervisor Sergeant Mateo Mojica, testified that they are not aware of any policy or practice that directs officers as to what to do when they receive notification from the Illinois State Police that putative drug material was determined to be non-narcotic. The Chicago Police Department training bulletin on reporting responsibilities for narcotics cases is silent as to any obligation to inform the prosecution of a negative lab result.

The Chicago Police Department has narcotics test kits available for officers to use in certain instances, predominately officers in the narcotics division.[2] The test kits are purchased

---

[2] Most of the support for Plaintiffs' *Monell* claim comes from deposition testimony given in another case, *Daniels v. City of Chicago*, Case No. 08-cv-6832, by a Chicago police officer, Michael Nunez, who is not a party to this case. In this case, Plaintiffs never noticed a 30(b)(6) deposition to gather evidence regarding field test kits, despite the fact that discovery was reopened on the *Monell* claim, and Plaintiffs sought no additional discovery after discovery was re-opened. Defendants deposed certain officers who were deposed in the *Daniels* case in order to clarify their testimony as to the issues presented in this case.

4

by the Organized Crime Division. The Department maintains that use of the test kits on a department-wide basis would be problematic due to chain of custody and contamination issues as well as the risk that field-testing could result in depleted samples of the suspect narcotics. However, the Department agrees that test kits are used department-wide and that any Chicago police officer can use the field test kits as long as it is for a "legitimate" purpose. The Department does not have a policy instructing officers about what they should do with the results of their field drug testing. There is no formal, department-wide training on the use of the test kits, although the kits include basic instructions.

On the date of Dewitt's arrest, the Chicago Police Department had in effect special orders which instruct officers to inventory, secure, and send all suspect narcotics to the Illinois State Police for testing. The orders do not instruct officers to conduct any "field testing" of suspect narcotics. The CPD does not have any department-wide orders regarding field testing, but, according to Defendants, it does have a special order regarding field testing that pertains to the narcotics division. However, officers in the narcotics division have testified that they were not aware of the order and that at best it is "outdated."

**III. Discussion**

    **A. Summary Judgment Standard**

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual disputes that are irrelevant to the outcome of the suit "will not be counted." *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003) (quotation marks and citations omitted). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw

all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

### B. *Monell* Claim

*Monell v. Department of Social Services of City of New York* provides that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." 436 U.S. 658, 691 (1978). Rather, "[a] municipality only may be held liable under § 1983 for constitutional violations caused by the municipality itself through its own policy or custom." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). In order to state a § 1983 claim against a municipality, the complaint must allege that an official policy or custom not only caused the

6

constitutional violation, but was "the moving force" behind it. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389 (1989); see also *Arlotta v. Bradley Center,* 349 F.3d 517, 521-22 (7th Cir. 2003); *Gable v. City of Chicago,* 296 F.3d 531, 537 (7th Cir. 2002). The "official policy" requirement for liability under § 1983 is to "distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479 (1986). "Misbehaving employees are responsible for their own conduct[;] 'units of local government are responsible only for their policies rather than misconduct by their workers.'" *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007)).

To state a § 1983 claim against a municipality, Plaintiffs must "allege that (1) the city had an express policy that, when enforced, causes a constitutional deprivation; (2) the city had a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage within the force of law; or (3) plaintiff's constitutional injury was caused by a person with final policymaking authority." *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). A city's "failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton*, 489 U.S. at 390. Establishing *Monell* liability based on evidence of inadequate training or supervision requires proof of "deliberate indifference" on the part of the local government. *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029 (7th Cir. 2006) (citing *City of Canton*, 489 U.S. at 388)). Proof of deliberate indifference can take the form of either "(1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated

complaints of constitutional violations by its officers." *Id*. at 1029-30 (citing *City of Canton*, 489 U.S. at 390 & n. 10)).

Plaintiffs claim that the police department does not provide officers with any instruction about how and when to conduct preliminary field tests. On the basis of these contentions, Plaintiffs insist that the City of Chicago faces *Monell* liability for its "utter failure to provide proper training to its officers on how to use those readily available kits." Plaintiffs further contend that the City's lack of a policy regarding field test kits resulted in the deprivation of Dewitt's rights. In other words, if Officers Uzcen and Iza had been able to conduct a preliminary field test of the vitamins right on the scene, or even at the police station, then they quickly could have determined that the substance in the capsules was not heroin, and Dewitt could have been spared the drug arrest, incarceration, and weeks of house arrest. Plaintiffs argue that they are not bringing a claim based on a "widespread practice" of the City; rather, they maintain that the lack of any policy constitutes unconstitutional City policy.

The express policy theory applies, as the name suggests, where a policy explicitly violates a constitutional right when enforced. See *Monell,* 436 U.S. at 658. Under this type of claim, one application of the offensive policy resulting in a constitutional violation is sufficient to establish municipal liability. See *City of Okla. v. Tuttle,* 471 U.S. 808, 822 (1985); see also *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005). A second way of complaining about an express policy is to object to omissions in the policy. This is essentially what Plaintiffs are doing. Plaintiffs frame the issue as there being a lack of a policy regarding field test kits for narcotics; however, it is no different to say that the City has a policy regarding the recovery of suspect narcotics and that policy omits reference to field testing—in other words, according to Plaintiffs' position, the City's policy on the how to deal with suspect narcotics has a "gap."

8

As the Seventh Circuit has indicated, it is "more confusing than useful to distinguish between claims about express policies that fail to address certain issues, and claims about widespread practices that are not tethered to a particular written policy." *Calhoun*, 408 F.3d at 379. In both of these situations, the claim requires more evidence than a single incident to establish liability. See *id.* (citing *Tuttle,* 471 U.S. at 822–23 (challenging the city's police officer training policy as inadequate)). As the Seventh Circuit noted in *Calhoun*:

> This is because it is necessary to understand what the omission means. No government has, or could have, policies about virtually everything that might happen. The absence of a policy might thus mean only that the government sees no need to address the point at all, or that it believes that case-by-case decisions are best, or that it wants to accumulate some experience before selecting a regular course of action. At times, the absence of a policy might reflect a decision to act unconstitutionally, but the Supreme Court has repeatedly told us to be cautious about drawing that inference. See, *e.g., Bd. of the County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (rejecting *Monell* claim based on absence of more thorough screening of candidates for sheriff's deputy); *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (rejecting a failure-to-train claim). Both in the "widespread practice" implicit policy cases and in the cases attacking gaps in express policies, what is needed is evidence that there is a true municipal policy at issue, not a random event.

*Calhoun*, 408 F.3d at 379.

Accordingly, the Supreme Court has held that "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the [omission in the policy or lack of a policy] and the constitutional deprivation." *Tuttle,* 471 U.S. at 824 (footnote omitted). As in *Calhoun*, in the present circumstances, the gap in the policy—or the absence of an express policy—may be a conscious decision by the Department to use field test kits on a case-by-case basis, or a decision to accumulate experience with the kits (used predominantly in one division and for obtaining search warrants) before

selecting a regular course of action. Moreover, it is not as if officers are not trained on how to handle suspect narcotics. The Department has a policy with respect to inventorying, securing, and processing seized suspect narcotics, and it appears that its policy was followed during the incident in question. The department-wide orders specifically provided for testing of all suspect narcotics by the Illinois State Police and do not instruct the officers to conduct any "field testing" of suspect narcotics recovered.[3] Plaintiffs have not presented any evidence that the stated rationale behind this policy—that only evidence tested by the Illinois State Lab is generally suitable to be presented in court for prosecution of criminal charges—is unreasonable. Thus, while at times the absence of a policy might reflect a decision to act unconstitutionally, one incident—which is all that Plaintiffs' have provided evidence of—in these circumstances is insufficient to establish that the need for a policy was so obvious that the municipality effectively exercised a deliberate indifference toward Plaintiff Dewitt's rights. See *Calhoun*, 408 F.3d at 379 (noting the Supreme Court's instruction that lower courts "be cautious" about drawing inferences that the absence of a policy reflects a municipal decision to act unconstitutionally); see also *Becker v. Porter County Sheriff's Dept.*, 2009 WL 500562 at *5 (N.D. Ill. Feb. 27, 2009).

Plaintiffs also assert that the municipality can be liable for the actions of its officers on a failure to train theory. Specifically, Plaintiffs argue that the officers were not trained on when or how to use a field test kit. To succeed on a failure to train theory, Plaintiffs must establish that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to

---

[3] Indeed, Defendants maintain that department-wide orders and training for all police officers regarding narcotic test kits would be inappropriate and unreasonable since police officers who recover suspect narcotics while making an arrest on patrol, such as Officers Uczen and Iza, would not be required, or expected, to perform a "field test" of any recovered suspect narcotics, and would instead be expected to follow D.S.O. 05-02 and 05-02-0.

10

have been deliberately indifferent to the need." *City of Canton v. Harris,* 489 U.S. 378, 390 (1989). The failure to train must reflect a deliberate or conscious choice by the municipality. *Id.* at 389. In addressing whether a city's failure to adequately train its police officers amounted to a policy for *Monell* purposes, the Supreme Court had the following to say: "[T]he word "policy" generally implies a course of action consciously chosen from among various alternatives; it is therefore difficult in one sense even to accept the submission that someone pursues a "policy" of "inadequate training," unless evidence be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policymakers deliberately chose a training program which would prove inadequate." *Tuttle,* 471 U.S. at 823, 105 S.Ct. 2427 (footnote omitted); see also *Harris,* 489 U.S. at 388 (finding liability should be imposed only when the degree of fault rises to the level of "deliberate indifference" to rights, that is, where the municipality's "choice to follow a course of action is made from among various alternatives by * * * policymakers") (quotations omitted).

Plaintiffs' allegations about the lack of training regarding field test kits are supported by only one event—the circumstances surrounding Dewitt Hughes' arrest on July 30, 2007. Plaintiffs have not come forward with evidence that any other specific individual has had similar problems arising from the lack of training on how or when to use field test kits. While Plaintiffs assert that there was "deliberate indifference" on the part of the City and "known and obvious consequences" that a failure to train would cause constitutional violations, they have failed to provide further factual support for these assertions beyond pointing to the incident with Plaintiff Dewitt. Plaintiffs have not demonstrated that the City was aware of a pattern of constitutional violations or that the City acquiesced to such a pattern. The most Plaintiffs have shown is an "isolated incident that * * * cannot support municipal liability." *Calhoun*, 408 F.3d at 380.

Plaintiffs' claim comes down to whether not having a policy regarding field testing and not training officers on the use of field test kits constitutes deliberate indifference on the part of the City to its citizens' rights. Plaintiffs theorize that because Officers Uczen and Iza had no knowledge of the field test kits (and, even if they did, were not trained on how to use them), Plaintiffs' rights were violated and *Monell* liability follows. However, Plaintiffs' theory ignores the training that the officers had (and followed) regarding the recovery of suspect narcotics at the scene of an arrest. That the policy does not provide instruction on how or when to use field test kits does not automatically mean that it should. Rather, given that Plaintiffs have offered no evidence of additional alleged violations beyond the present incident to support their claims at the summary judgment stage, the Court concludes that Plaintiffs have not come forward with enough to overcome the concerns expressed by the Supreme Court in *Tuttle* and the Seventh Circuit in *Calhoun*. In short, although Defendant Officers remain in the case to answer for their individual conduct at trial, Plaintiffs have fallen short of demonstrating that gaps in the City's policies and training were the moving force behind Plaintiff Dewitt's injuries or that the City was deliberately indifferent to their constitutional rights. See also *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1298 (7th Cir. 1989) (noting that "in almost every instance where a § 1983 plaintiff has suffered a violation of his constitutional rights by a government employee the plaintiff can point to something that the government could have done to protect against that unfortunate incident.").

**III.     Conclusion**

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiffs' remaining Monell claim [159].

Dated:  November 8, 2011                    _____
                                                                            Robert M. Dow, Jr.
                                                                            United States District Judge